08-1375-pr
*Bierenbaum v. Graham*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————

August Term, 2008

(Argued: July 8, 2009                              Decided: May 25, 2010)

Docket No. 08-1375-pr

————————————

ROBERT BIERENBAUM,

*Petitioner-Appellant,*

—v.—

HAROLD D. GRAHAM, THE SUPERINTENDENT OF AUBURN CORRECTIONAL FACILITY,
ANDREW CUOMO, ATTORNEY GENERAL STATE OF NEW YORK,

*Respondents-Appellees.*

————————————

B e f o r e :

CALABRESI, HALL, *Circuit Judges*, SESSIONS,[*] *District Judge*

————————————

Appeal from the denial of a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 by the United States District Court for the Southern District of New York (Sweet, *J.*). Petitioner-Appellant Robert Bierenbaum argues that his trial counsel rendered ineffective

--------------------------------------

[*] The Honorable William K. Sessions III, Chief Judge, United States District Court for the District of Vermont, sitting by designation.

assistance in violation of the Sixth Amendment, and that out-of-court statements were admitted at trial in violation of the Confrontation Clause of the Sixth Amendment.

AFFIRMED.

CALABRESI, Circuit Judge, filed a concurring opinion.

_____

MARCIA J. SILVERS, Marcia J. Silvers, P.A., Miami, Florida, and MARK D. SEIDEN, Mark Seiden, P.A., Miami, Florida, *for Petitioner-Appellant.*

MARK DWYER, Assistant District Attorney, *on behalf of* Robert M. Morgenthau, District Attorney, New York County, New York, New York, *for Respondents-Appellees.*

_____

SESSIONS, *District Judge*:

Petitioner-Appellant Robert Bierenbaum was convicted after a jury trial of murder in the second degree, *see* N.Y. Penal Law § 125.25[1], and sentenced to a term of imprisonment of twenty years to life. Currently incarcerated, Bierenbaum appeals from the February 26, 2008 judgment of the United States District Court for the Southern District of New York (Sweet, *J.*) that denied his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See Bierenbaum v. Graham*, No. 06 Civ. 2120, 2008 WL 515035 (S.D.N.Y. Feb. 25, 2008).

Bierenbaum claims that he was denied his Sixth Amendment right to effective assistance of counsel at trial, and that the admission at trial of numerous out-of-court statements made by the victim violated the Confrontation Clause of the Sixth Amendment. We affirm.

## BACKGROUND

Bierenbaum's wife, Gail Katz Bierenbaum, was last seen on July 7, 1985. Her body was never found. In 1999 Bierenbaum was indicted and charged with murder in the second degree in her death. After an eight-day trial by jury in October 2000 before the Honorable Leslie Crocker

2

Snyder in the Supreme Court of the State of New York, County of New York, the jury returned a verdict of guilty to the charge. Bierenbaum was sentenced on November 29, 2000.

### A. The Disappearance of Gail Katz Bierenbaum

Gail Katz and Robert Bierenbaum were married in August 1982. They resided in a twelfth-floor apartment on East 85th Street in Manhattan. Bierenbaum had graduated from medical school in 1978, and was a surgical resident at Maimonides Medical Center in Brooklyn, New York. Katz was a graduate student pursuing a Ph.D. degree in clinical psychology at Long Island University.

On Saturday, July 6, 1985, Katz kept a follow-up appointment with her gynecologist, and made a further appointment in December. She kept an appointment with her hairdresser, and met with a close friend that afternoon for a couple of hours. She told her friend that she was going to leave her husband that weekend, and that she was looking for another place to live.

On the evening of Sunday, July 7, 1985, Bierenbaum attended a family gathering for a nephew's birthday in New Jersey, without Katz. Bierenbaum said that she had gone out earlier in the day and had not returned to their apartment. Although Bierenbaum did not express any concern about his wife at the party, later that evening at a friend's house he appeared distraught and called the apartment a couple of times. To his friend he related that he and Katz had an argument that morning and that she had left the apartment to sunbathe in Central Park wearing shorts, sandals and a halter top.

Close to midnight that evening Bierenbaum telephoned Dr. Yvette Feis, one of Katz's friends, asking if she knew where Katz was. Bierenbaum told Feis that they had had an

3

argument, that she had gone to Central Park and not returned, and that she was still missing when he returned from a family party in New Jersey.

Katz did not keep her regularly scheduled psychotherapy appointment on July 8. Bierenbaum called her therapist and others on that day asking if they had seen her. That evening Bierenbaum filed a missing persons report indicating that when Katz was last seen she was wearing pink shorts and a white t-shirt. He told the detective assigned to investigate the case that he had last seen his wife on July 7 at approximately 11 a.m., and that she had left the apartment to get some sun in Central Park. He told the detective that he remained at home until approximately 5:30 p.m., when he left for New Jersey.

No one, other than Bierenbaum, reported seeing Katz after July 6.

**B.        Investigation**

Detective Virgilio Dalsass from the 19th precinct, where Bierenbaum and Katz resided, and Detective Thomas O'Malley from the Missing Persons Bureau were assigned to investigate the case. In the week after Katz was reported missing, Dalsass left several telephone messages for Bierenbaum, none of which were returned. Dalsass had numerous telephone calls from members of Katz's family during that same time period. On July 14, Dalsass met with Bierenbaum, his father and Katz's parents. Dalsass asked Bierenbaum to narrate specifically and exactly how he spent the weekend that Katz disappeared. Bierenbaum stated that he had come home from work at approximately 5 p.m. on Friday evening, that they went to a movie about 8 p.m. and returned about midnight. He described going to work Saturday morning, leaving the hospital and visiting his father, returning home around noon to go out to eat and do some

4

shopping with his wife, including buying bras at a lingerie store and cat food at a pet supply store. Katz cooked steaks that night and they had a romantic candlelight dinner.

Bierenbaum told Dalsass that he had awakened at approximately 9:30 Sunday morning, that Katz had received a telephone call from an acquaintance that disappointed her, and that she left at about 11 a.m. after an argument, telling him that she intended to go to Central Park to get some sun. Bierenbaum repeated that he had remained in the apartment all day until 5:30 p.m., when he left for the family party in New Jersey, arriving there at approximately 6:30 p.m. He returned from New Jersey at approximately midnight. He called Katz's mother to see if she had heard from Katz, and went to bed. The next morning he went to work, and that evening reported Katz missing.

The police searched for Katz between her apartment and Central Park and found no trace of her. Friends and family posted pictures of Katz in the neighborhood. Dalsass contacted several individuals whose names he had obtained from Bierenbaum or Katz's family who might have information about Katz. These included Ellen Schwartz, Francesca Beale, Katz's therapist Dr. Sybil Baran, Anthony Segalas and Kenneth Feiner.

Bierenbaum had contacted O'Malley on July 10 to inquire about the progress of the investigation. He advised O'Malley that their building doorman, Edgar, had seen Katz leave at about 11 a.m. on July 7. O'Malley met with Bierenbaum on the 13th and requested details of the previous weekend. Bierenbaum told O'Malley that he and Katz had a mild argument Friday night which continued on Saturday, whereupon Katz told him that she was going to Central Park to cool off at about 11 a.m. Bierenbaum said that he had spent some time at the apartment

5

waiting for Katz to return, but then left at some point to visit his family in New Jersey. He said that he had called Katz's mother and two of her friends to see if she was there. When O'Malley asked him why he waited until the evening of the following day to report Katz missing, Bierenbaum stated that he felt she would return, and when she didn't friends advised him to notify the police. During their second conversation, Bierenbaum told O'Malley that he had been mistaken and that the doorman thought it was another day that he had seen Katz.

Bierenbaum told O'Malley that the marriage was in bad shape and that both of them were in therapy to attempt to improve their relationship. He told O'Malley that Katz was depressed and suicidal. O'Malley asked if Bierenbaum had ever hit his wife. Bierenbaum said no. O'Malley asked if he had ever choked his wife to the point of unconsciousness, and Bierenbaum said that he didn't want to speak about that.

In July, early in the investigation, Dalsass asked Bierenbaum if he could look around the apartment. Bierenbaum said he would get back to him, but did not. In September Dalsass finally secured permission to search Bierenbaum's apartment. Bierenbaum's attorney gave permission for the police to search for fingerprints and anything that might help them identify Katz. Although the police wished to search for any evidence that would shed light on Katz's disappearance, the investigators felt they did not have probable cause to obtain a search warrant. The search was thus limited to the scope of the permission given. This limited search was conducted on September 30; nevertheless at that time Dalsass looked around the apartment to see if he could detect any evidence that a crime had been committed there. He did not find anything.

In September 1986 Hope Martin, an investigator from the District Attorney's office, was

6

assigned to investigate Katz's disappearance.  Martin learned that Bierenbaum was a licensed

pilot.  She wanted to know whether Bierenbaum had flown an airplane on the day of his wife's

disappearance.  On October 17, 1986 she learned that Bierenbaum had rented an airplane from

Mac Dan Aircraft Rental at Caldwell Airport in Fairfield, New Jersey on July 7, 1985, the day

Katz disappeared.  A forensic examination of the aircraft yielded no results.  Forensic tests of

two automobiles that Bierenbaum was driving at the time also yielded no results.

The investigation was closed in April 1987.  In May 1989 a torso found washed up on a

beach in Staten Island was determined by x-ray comparison to be Katz.  In 1998 the investigation

was reopened, and the body was exhumed and determined by DNA comparison not to be Katz.

Bierenbaum was charged with murder in the second degree in an indictment returned December

8, 1999.

### C.    The Evidence at Trial

In addition to the evidence detailed above, the prosecution marshaled a wealth of

circumstantial evidence that, in the words of the Appellate Division, "when . . . attentively

review[ed] and critically assesse[d] . . ., and after applying all natural and reasonable inferences,"

led to the "inescapable" conclusion that Bierenbaum murdered his wife on July 7, 1985, "and the

evidence excludes beyond a reasonable doubt any reasonable hypothesis of innocence." *People

v. Bierenbaum*, 748 N.Y.S.2d 563, 574 (N.Y. App. Div. 2002).  The evidence at trial was set

forth in detail in the district court's February 25, 2008 opinion, and we recount below only the

evidence necessary to resolve the issues presented on appeal.

7

### 1.    Katz's statements

Over defense objection eleven witnesses--friends, relatives, colleagues and Katz's therapist--were permitted to testify about conversations they had with Katz between 1983 and 1985 in which she talked about the state of her marriage, her fear of Bierenbaum's temper, his controlling behavior, his threats, and an argument in 1983 during which he choked her to the point of unconsciousness. Certain of these witnesses also testified that Katz told them she had received a letter from Bierenbaum's therapist warning her that Bierenbaum was a danger to her, and that Katz intended to threaten Bierenbaum with disclosure of this letter. The trial court permitted this testimony as background evidence of the state of the marriage and Katz's state of mind, and Bierenbaum's motive, intent and identity. The trial court gave a limiting instruction to that effect after each witness's testimony and at the close of trial, and admonished the jury that they were not to take this testimony as proof that Bierenbaum had acted in accordance with the statements, or as evidence of propensity.

Hillard Wiese, Katz's cousin, testified that Katz reported to him in the fall of 1983 that she had an argument with her husband during which he had choked her to unconsciousness. This was not the first time Bierenbaum had choked her, but it was the first time that she lost consciousness. Wiese advised her to leave immediately. Katz moved out and lived for a time with her grandfather.

Alayne Katz, Katz's sister, testified that Katz had called her in the fall of 1983, extremely upset, and told her that her husband had tried to strangle her, that she lost consciousness, Bierenbaum revived her and apologized profusely. Alayne Katz testified that her sister told her

8

about a letter she had received from Bierenbaum's psychiatrist warning her about Bierenbaum's potential for dangerousness and advising her to move out. She also testified that they had many times discussed Katz separating from her husband.

Dr. Leigh McCullough, Katz's employer in the fall of 1983, noticed bruises on Katz's neck one day. McCullough testified that Katz told her that her husband had gotten angry at her and choked her because she had been smoking a cigarette. Katz confided in McCullough that she was having difficulty in her marriage, and that she and Bierenbaum fought a lot.

Denise Kasenbaum, a friend, testified that Katz had told her there were problems in the marriage, incidents of violence, that Bierenbaum was very controlling, and that she was not happy. Katz recounted an incident when Bierenbaum discovered her smoking a cigarette, got very angry, came at her and choked her. Katz also told Kasenbaum that she had gotten a letter from Bierenbaum's psychiatrist. Kasenbaum testified that Katz told her she was having an affair with a colleague at a hospital where she was interning. Kasenbaum saw Katz on the day before she disappeared. Katz told her that she was looking for an apartment and that she was going to tell her husband that weekend that she was leaving.

Francesca Beale, a former employer, testified that in a telephone conversation in 1983, Katz said that her husband had a terrible temper, that she was afraid of him. Katz asked Beale if she could move in with her.

Maryann DeCesare, a friend, testified that Katz told her that she was afraid of Bierenbaum's temper and that he had threatened her. Katz told DeCesare that she had gone out on the terrace of their apartment to smoke a cigarette, where he confronted her and choked her.

9

Katz told DeCesare that she was unconscious, and that Bierenbaum had to call 9-1-1 for assistance. Often thereafter Katz would ask her for advice: would DeCesare leave her husband if he threatened to strangle her; had DeCesare's husband ever threatened to hurt her; should she leave Bierenbaum. DeCesare testified that Katz told her that Bierenbaum had threatened to kill her if she left him. In another conversation Katz told DeCesare that she and Bierenbaum had discussed the Claus von Bulow case, and that Bierenbaum had said the problem with the case was that von Bulow left evidence and that he would leave no evidence. A few days before she disappeared, Katz told DeCesare that she had met someone in whom she was interested, and she wondered if DeCesare thought it would be all right if she brought him up to the apartment when Bierenbaum wasn't there. She also told DeCesare that she thought she was being followed. In their last telephone conversation, Katz told DeCesare that she planned to ask Bierenbaum for a divorce, and that she had secretly borrowed $10,000.00 and put it in a safe deposit box to pay for a year of graduate school.

Dr. Kenneth Feiner developed a romantic relationship with Katz in the months prior to her disappearance. He testified that Katz discussed with him her wish to leave her husband, their constant fights and arguments, and one argument during which Bierenbaum put his hands to her neck. Katz told him that she was going to move in with her friend Ellen Schwartz in Connecticut.

Katz had an affair with Anthony Segalas, an investment banker, during the summer of 1984 and the spring of 1985. Segalas testified that Katz told him she was in a very unhappy marriage, that she was afraid of her husband and that he had tried to strangle her once. More

10

recently she talked of moving in with a girlfriend in Connecticut. Segalas and Katz used cocaine together.

Dr. Yvette Feis, Katz's former professor and friend, testified that Katz told her she was looking for other sexual partners. In 1984 Katz told her about a time in 1983 when Bierenbaum noticed her smoking a cigarette on the terrace of their apartment, became violent and began choking her. Late in 1984 or early 1985 Katz told her that she had received a letter from Bierenbaum's psychiatrist warning her that Bierenbaum posed a danger to her, and suggesting that Katz separate from him. Katz told Feis that she intended to use the letter as leverage in divorce proceedings by threatening to use it to ruin his career.

Dr. Sybil Baran, Katz's therapist, testified that Katz was afraid of Bierenbaum's anger. Katz told her about an incident, precipitated by smoking, when Bierenbaum became enraged and attempted to strangle her. In the four to six months before she disappeared she told her therapist that she was looking for an apartment so that she could separate from Bierenbaum.

Dr. Ellen Schwartz, a close friend from graduate school, testified that Katz told her she was afraid of her husband, and that she was planning to leave him soon. Katz told her that the night before she took her Graduate Record Exam, Bierenbaum choked her to unconsciousness because she smoked a cigarette.

### 2. The videotapes

Dr. Charles Hirsch, Chief Medical Examiner for New York City, testified that prior to the onset of rigor mortis, a dead body is "pliable." The body of a woman five feet three inches tall, weighing about one hundred ten pounds could be folded and tied into a "package" about thirty-

11

six inches long. Hirsch also stated that a body could be "disarticulated" at the joints, a simple process that someone trained in anatomy could accomplish in ten minutes.

There was evidence that Bierenbaum regularly carried heavy duffel bags. The jury also learned that a Cessna 172 Skyhawk, the airplane that Bierenbaum rented, is a stable, easy-to-handle four passenger aircraft. An inspector for the Federal Aviation Administration testified that in his opinion a pilot could singlehandedly dispose of something from the plane without a great deal of difficulty.

Sergeant Matthew Rowley of the New York police department's Aviation Unit executed three flights in a Cessna 172 from Caldwell Airport on October 11, 2000, during the trial. Three times Rowley loaded a bag containing one hundred ten pounds of sand and rice into the plane, flew out over the ocean, and ejected the bag, each time performing a different maneuver to get the bag out of the plane. The performance was videotaped, and the jury was shown the tapes.

### 3. Bierenbaum's inconsistent statements

Over the years between Katz's disappearance and his trial for her murder, Bierenbaum offered various accounts of his activities and various theories concerning her whereabouts. Consistently absent from any of his accounts of his activities on Sunday, July 7, 1985 was the fact that he rented an airplane in New Jersey that afternoon and went flying. Bierenbaum gave detailed statements of his activities to both investigating officers in the days following Katz's disappearance. He lied to both officers, telling both of them that he had remained in the apartment until approximately 5:30 p.m. when he left for the party in New Jersey. At 4:30 p.m. he was already in New Jersey, flying his rented airplane.

12

About three weeks after Katz disappeared, Bierenbaum began an affair with Karen Caruana, a nurse educator at Maimonides Medical Center where Bierenbaum was a surgical resident. The affair began while Bierenbaum was vacationing in South Hampton on Long Island during the month of August, and lasted about six weeks. During that period Caruana and Bierenbaum discussed Katz's disappearance. Caruana testified that Bierenbaum told her that his apartment and car had been searched and that he was clean as far as any police investigation was concerned. She stated that he told her this before the end of September. At that time the police had not searched his apartment or car.

Bierenbaum told Caruana that he had hired a private investigator who had found evidence that Katz was in California. To the owner of Bierenbaum's vacation rental property in South Hampton, he speculated that Katz had a drug problem and that she had disappeared with drug dealers. He told another renter that he had gone looking for Katz in Central Park, found her towel and suntan lotion, but she was gone.

Bierenbaum told Katz's friend Ellen Schwartz that he had spoken with Katz's therapist Dr. Baran, who had told him that Katz was very depressed and she was concerned that Katz might hurt herself. Dr. Baran denied that she'd had such a conversation with Bierenbaum and denied that Katz was suicidal. Two or three months later Bierenbaum told another of Katz's friends, Maryann DeCesare, that he thought she was waitressing by a seaside community. DeCesare said that Bierenbaum often mentioned water, that Katz was "outside cooling off."

Dr. Roberta Karnofsky, an anesthesiologist, had a year-long relationship with Bierenbaum beginning in fall 1985, while she was a medical student under his supervision. He told

13

Karnofsky that he had gotten into an argument with his wife one day, that she went to cool off in Central Park, that she had been seen one time around the area of Central Park, but had never been seen again. To Karnofsky Bierenbaum speculated that Katz was in a "fugue state" or that she had run off with someone to the Caribbean. Bierenbaum told Karnofsky that the police had asked him if he had removed the apartment rug or had it cleaned, and that he had answered that he had not. Katz's friend Yvette Feis was in the apartment several days after Katz was reported missing, noticed that the living room rug was gone and asked about it. Bierenbaum told Feis that the cats had fouled the rug and that he was having it cleaned.

Dr. Stephanie Youngblood, a chiropractor who lived with Bierenbaum from 1990 to 1993, testified that Bierenbaum told her that Katz had a drug problem, was having extramarital affairs, and that he felt her death was drug-related: "[h]e felt she went to Central Park to hang out with her druggie friends."

### 4. Bierenbaum's defense

The defense called one witness, Joel Davis. Davis had been in a bagel shop in Manhattan on Second Avenue in the '80's on the afternoon of July 7, 1985, and he noticed an attractive woman wearing a distinctive t-shirt with a non-English word on it. When two weeks later he saw posters of Katz, he identified her as the woman he had seen, and he called the police. He described her to the jury as deeply tanned, about five foot one, with a well-developed body. On cross-examination Davis admitted that he had told an investigator for the defense that the woman he'd seen was tall and statuesque, and explained that he had confused his description of the missing woman by likening her to two different women, one tall with her face and one short with

14

her body.

The prosecution called Katz's sister Alayne as a rebuttal witness. She provided a picture of Katz from the summer of 1985, and described her as less than five foot three, weighing approximately 110 pounds, with an A-cup bra size.

### D.     Post-Trial Proceedings

On appeal to the Appellate Division, First Department, Bierenbaum argued that his guilt was not proven beyond a reasonable doubt. He also argued, among other issues, that the trial court erroneously 1) allowed the jury to learn of the existence and nature of the letter written to Katz by Bierenbaum's psychiatrist warning her of the danger Bierenbaum posed to her; (2) allowed various people to testify about Katz's verbal statements to them describing Bierenbaum's threatening remarks and behavior; and (3) permitted the jury to watch the videotaped demonstration showing how a pilot flying solo may load a duffel bag containing a 110-pound body into a Cessna 172 airplane, fly over the ocean and eject the bag.

The Appellate Division rejected these claims and affirmed the conviction on October 22, 2002. *See Bierenbaum*, 748 N.Y.S.2d at 589. Leave to appeal to the New York Court of Appeals was denied on March 10, 2003. *See People v. Bierenbaum*, 790 N.E.2d 281 (N.Y. 2003). Bierenbaum's petition for a writ of certiorari to the United States Supreme Court was denied on October 6, 2003. *See Bierenbaum v. New York*, 540 U.S. 821 (2003).

After Bierenbaum's direct appeal was concluded, he filed a motion with the trial court to set aside the judgment on the grounds that trial and appellate counsel had rendered ineffective assistance of counsel. The motion was denied on September 6, 2005, and leave to appeal was

15

denied on January 12, 2006. Bierenbaum then filed a petition for writ of error *coram nobis* in the Appellate Division contending that appellate counsel had provided ineffective assistance. The petition was denied on March 9, 2006. Leave to appeal that decision to the New York Court of Appeals was denied on May 30, 2006. *See People v. Bierenbaum*, 850 N.E.2d 674 (N.Y. 2006).

On March 17, 2006, Bierenbaum filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of New York. In his petition he alleged that he was denied his Sixth Amendment right to effective assistance of counsel, and that admission of numerous hearsay statements violated his Sixth Amendment right to confront witnesses against him. He requested an evidentiary hearing. On February 25, 2008, the district court denied the petition without conducting an evidentiary hearing. *See Bierenbaum v. Graham*, No. 06 Civ. 2120, 2008 WL 515035 (S.D.N.Y. Feb. 25, 2008). This Court granted a certificate of appealability on September 23, 2008.

## II.     Discussion

### A. Standard of Review

We review de novo a district court's decision to deny a petition for a writ of habeas corpus. *E.g.*, *Henry v. Ricks*, 578 F.3d 134, 137 (2d Cir. 2009). We may not consider a state prisoner's application for a writ of habeas corpus unless the applicant has exhausted available state remedies by "fairly present[ing] his claim in each appropriate state court (including a state supreme court with powers of discretionary review)." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks omitted); *accord Georgison v. Donelli*, 588 F.3d 145, 153 (2d Cir. 2009); *see* 28 U.S.C. § 2254(b)(1)(A). "'A petitioner has fairly presented his claim only if he has

16

informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'" *Jones v. Keane*, 329 F.3d 290, 294-95 (2d Cir. 2003) (internal quotation marks omitted) (quoting *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997)).

If a state court decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment," *Coleman v. Thompson*, 501 U.S. 722, 729 (1991), we will not review the issue. *See Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007). "The rule applies with equal force whether the state-law ground is substantive or procedural." *Lee v. Kemna*, 534 U.S. 362, 375 (2002). A "state law ground is only adequate to support the judgment and foreclose review of a federal claim if it is 'firmly established and regularly followed' in the state," and application of the rule would not be "exorbitant." *Garvey v. Duncan*, 485 F.3d 709, 713-14 (2d Cir. 2007) (quoting *Lee*, 534 U.S. at 376).

When a state court has adjudicated the merits of a petitioner's claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also, e.g.*, *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir. 2008). Under §2254(d)(1), a state-court decision is contrary to clearly established Supreme Court precedent if its "conclusion on a question of law is 'opposite' to that of the Supreme Court or if the state court decides a case differently than the Supreme Court's decision 'on a set of materially indistinguishable facts.'" *Id.* (quoting *Williams*

17

*v. Taylor*, 529 U.S. 362, 413 (2000)). A state court decision involves an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal principle but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case. *See Williams*, 529 U.S. at 413; *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000); *accord Kennaugh v. Miller*, 289 F.3d 36, 45 (2d Cir. 2002).

A state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Drake v. Portuondo*, 553 F.3d 230, 239 (2d Cir. 2009).

### B. Exhaustion

The district court determined that Bierenbaum failed to exhaust his state court remedies with regard to his Confrontation Clause claim, finding that he did not argue the claim in his application for leave to appeal to the New York Court of Appeals. The respondents argued this position below, but on further review have withdrawn their argument, agreeing with Bierenbaum that he presented his constitutional claim in his letter brief submitted to the New York Court of Appeals on December 10, 2002.

On appeal to the Appellate Division, First Department, Bierenbaum presented, among other questions, the following: "Whether Dr. Bierenbaum was denied a fair trial by the improper admission of widespread testimony recounting statements purportedly made by Ms. Bierenbaum, which did not satisfy any hearsay exception or the confrontation clause of the state and federal constitutions . . .?" Similarly, in his letter seeking leave to appeal to the New York Court of Appeals, he argued that leave should be granted "to review the admissibility of background

18

evidence through hearsay declarations, whether in 'domestic violence' cases or otherwise, and to consider whether admission of such evidence denies a defendant his state and federal rights of confrontation."

The Appellate Division did not explicitly address Bierenbaum's confrontation clause claim,[1] and the Court of Appeals denied leave to appeal without explanation. "'[T]he question of whether a federal constitutional question was sufficiently asserted in state courts to form the basis of a federal habeas petition is . . . a question of federal law which the federal courts must resolve for themselves.'" *Acosta v. Artuz*, 575 F.3d 177, 185 (2d Cir. 2009) (quoting *DiSimone v. Phillips*, 461 F.3d 181, 189 (2d Cir. 2006)). A state prisoner may fairly present to the state courts the constitutional nature of his claim by "claim[ing] the deprivation of a particular right specifically protected by the Constitution." *Daye v. Att'y Gen. of the State of N.Y.*, 696 F.2d 186, 193 (2d Cir. 1982) (en banc). Here, Bierenbaum expressly invoked the Confrontation Clause to both appellate courts. "[T]o qualify as an adjudication 'on the merits,' a state court decision need not mention a particular argument or explain the reasons for rejecting it." *Dallio v. Spitzer*, 343 F.3d 553, 560 (2d Cir. 2003); *see also Brown v. Artuz*, 283 F.3d 492, 498 (2d Cir. 2004) (finding that Sixth Amendment claim was adjudicated on the merits when state court dismissed it by stating "defendant's remaining contentions are without merit."). We therefore conclude that the state courts were fairly alerted to the constitutional claim, Bierenbaum has exhausted his available state remedies with respect to the claim, and we may reach the merits of the claim. *See*

---

[1] At the close of its opinion, the Appellate Division disposed of the arguments it did not address as follows: "We have examined defendant's remaining contentions and find them unavailing." *Bierenbaum*, 748 N.Y.S.2d at 589.

19

*Galdamez v. Keane*, 394 F.3d 68, 78 (2d Cir. 2005) (reaching the merits of petitioner's confrontation clause claim where briefs and leave application, fairly construed, raised the issue).

**C.      Confrontation Clause**

The Confrontation Clause of the Sixth Amendment to the United States Constitution states: "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Throughout Bierenbaum's trial and the direct appeal of his conviction, the admission of statements by a declarant not present at trial was governed by *Ohio v. Roberts*, 448 U.S. 56 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004)). Under *Roberts*, the statements of an unavailable hearsay declarant were "admissible only if [they bore] adequate 'indicia of reliability,'" which could be satisfied by demonstrating that the evidence fell "within a firmly rooted hearsay exception," or that the evidence had "particularized guarantees of trustworthiness." 448 U.S. at 66.

The United States Supreme Court decisions in *Crawford* and *Davis v. Washington*, 547 U.S. 813 (2006), confined the scope of the Confrontation Clause to testimonial statements. *See Davis*, 547 U.S. at 824 (holding that limiting the Confrontation Clause to testimonial hearsay is "clearly reflected in the text of the constitutional provision"); *United States v. Feliz*, 467 F.3d 227, 232 (2d Cir. 2006) ("[A]fter *Crawford* and *Davis*, . . . . the inquiry under the Confrontation Clause is whether the statement at issue is testimonial."); *accord United States v. Williams*, 506 F.3d 151, 156 (2d Cir. 2007). Nontestimonial statements therefore do not implicate the Confrontation Clause. *See Feliz*, 467 F.3d at 232.

Bierenbaum argues that the challenged statements were inadmissible under either the

20

*Roberts* or the *Crawford* and *Davis* standard:  that the statements were admitted for their truth, that no hearsay exception applied, that the statements showed no particularized guarantees of trustworthiness, and that the statements were testimonial.

In *Whorton v. Bockting*, 549 U.S. 406, 421 (2007), the Supreme Court held that *Crawford* announced a new rule that would not apply retroactively on collateral review.  Moreover, a federal court must apply the clearly established "Supreme Court jurisprudence as of either the date of the pertinent state court 'adjudicat[ion] on the merits,' or the date when the state court conviction became final."  *Mungo v. Duncan*, 393 F.3d 327, 333-34 (2d Cir. 2004).  As of 2002 when his claim was adjudicated on the merits, and 2003 when his conviction became final, *Ohio v. Roberts* governed his claim.  Thus, Bierenbaum's challenge to the admission of Katz's statements must be evaluated under *Roberts*.

Assuming that Katz's statements were admitted for the truth of the matters asserted,[2] they meet the *Roberts* standard for admissibility.  The Appellate Division analyzed the reliability of the challenged statements under the rule for determining reliable hearsay set forth by the New York Court of Appeals in *Nucci v. Proper*, 744 N.E.2d 128 (N.Y. 2001):

> Reliability is the sum of the circumstances surrounding the making of the statement that render the declarant worthy of belief.  Relevant factors include spontaneity, repetition, the mental state of the declarant, absence of motive to fabricate, unlikelihood of faulty recollection and the degree to which the statement was against the declarant's interest.  Courts have also considered the status or relationship to the declarant of the person to whom the statement was made, whether there was a coercive atmosphere, whether it was made in response to

---

[2]  Respondents assert in the alternative, and the district court agreed, that with one exception the statements were not admitted for their truth.  We need not address this argument because of our disposition of this issue under *Roberts*.

21

questioning and whether the statements reflect an attempt to shift blame or curry favor.

*Id.*, 744 N.E.2d at 131 (citations, internal quotation marks and ellipses omitted). The Appellate Division ruled that the statements bore numerous hallmarks of reliability:

> She was speaking spontaneously; she repeated the statements separately to various people in her life; her statements about the troubled side of their marriage were a natural consequence of corroborated facts about their marriage; she was, by all indications, in good mental health; there appears no reason for her to have fabricated the matters she discussed at the time of her utterances; and her statements largely concerned private matters that some would be embarrassed or otherwise reluctant to disclose. Furthermore, the statements were made mostly to those close to her, in contexts completely devoid of coercion, not in response to anyone's questioning, nor under circumstances at all suggestive of any attempt to curry anyone's favor.

*Bierenbaum*, 748 N.Y.S. 2d at 583-84. It was not unreasonable for the Appellate Division to conclude that the reliability of Katz's statements was "amply supported." *Id.* at 583. Indeed, Bierenbaum does not argue to this Court (except parenthetically) that the challenged hearsay declarations were in fact unreliable. The passage quoted above demonstrates that the Appellate Division found particularized guarantees of trustworthiness in the challenged statements. This conclusion was neither contrary to nor an unreasonable application of the Supreme Court's Confrontation Clause precedent in 2002 and 2003.

### D. Ineffective Assistance of Counsel

To show ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), Bierenbaum "'must (1) demonstrate that his counsel's performance fell below an objective standard of reasonableness . . . and (2) affirmatively prove prejudice arising from counsel's allegedly deficient representation.'" *Brown v. Greene*, 577 F.3d 107, 110 (2d Cir.

22

2009) (quoting *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008)). To satisfy the first part of the test--performance--he must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The *Strickland* standard is "rigorous," *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007):

> Judicial scrutiny of counsel's performance must be highly deferential[;] . . . every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689 (citations and internal quotation marks omitted).

To satisfy the second part of the *Strickland* test--prejudice--Bierenbaum "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Bierenbaum lists nine errors that he contends are objectively unreasonable: (1) failing to move to dismiss the indictment due to pre-trial delay; (2) conceding that Katz died on July 7, 1985; (3) "opening the door" to testimony and argument that Dr. Bierenbaum and his lawyer refused to consent to a forensic search of his apartment; (4) failing to call two witnesses who allegedly would have supported his claim that Katz left the apartment on the morning of July 7; (5) failing to cross-examine effectively a witness who minimized his use of cocaine with Katz; (6) failing to object to the admission of the videotaped demonstration of the prosecution's theory

23

of how Bierenbaum disposed of his wife's body; (7) failing to move for a trial order of dismissal on the grounds of insufficient evidence of the element of intent to kill; (8) failing to make a timely objection to improper remarks in summation; (9) failing to request a jury charge on jurisdiction.

### 1. Pre-Indictment Delay

Defense counsel did not move to dismiss the indictment for undue delay. "Oppressive" prosecutorial delay may violate the Due Process Clause of the United States Constitution. *See United States v. Lovasco*, 431 U.S. 783, 789 (1977). To prevail on such a claim under federal law, Bierenbaum must prove that the delay resulted in actual prejudice and that the prosecution's reasons for the delay were improper. *United States v. Langella*, 776 F.2d 1078, 1083 (2d Cir. 1985) (citing *Lovasco*, 431 U.S. at 790); *accord United States v. Cornielle*, 171 F.3d 748 (2d Cir. 1999).

Under New York law, the prosecution must establish good cause for extended delay, but "'a determination made in good faith to delay prosecution for sufficient reasons will not deprive defendant of due process even though there may be some prejudice to defendant.'" *People v. Decker*, 912 N.E.2d 1041, 1042 (N.Y. 2009); *see* N.Y. Const. art. I, § 6. "[I]n a proper case, a lengthy and unjustifiable delay in commencing the prosecution may require dismissal even though no actual prejudice to the defendant is shown." *People v. Singer*, 376 N.E.2d 179, 186 (N.Y. 1978). In determining whether prosecution has been unduly delayed, a New York court will balance five factors:

> "(1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial

24

incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay."

*Decker*, 912 N.E.2d at 1043 (quoting *People v. Taranovich*, 335 N.E.2d 303, 306 (N.Y. 1975)).

Bierenbaum argued undue pre-indictment delay to the state court in his motion to set aside the judgment. The state court weighed the five *Taranovich* factors and concluded that if defense counsel had moved to dismiss the indictment, the motion would unquestionably have been denied. Although the delay was substantial, Bierenbaum suffered no prejudice, and he was not incarcerated prior to trial. Given the seriousness of the charge, the circumstantial nature of the evidence, and no evidence of any improper motive on the part of the prosecution, the motion had no chance of success.

The state court concluded therefore that defense counsel was not ineffective for failing to move to dismiss for pre-indictment delay. Had defense counsel moved to dismiss the indictment, the motion would not have been granted, and therefore there was no reasonable probability that the outcome--proceeding to trial-- would have been different. The state court's conclusion was a reasonable application of *Strickland*.

### 2. Defense Counsel's Concession

Trial counsel conceded in his opening statement that Katz died on July 7, 1985: "[L]et's talk about some things that are not at issue here. First of all, it is not disputed by us that Gail Katz Bierenbaum is dead. That is not disputed. Not only that's not disputed by us, but that she likely died some time on July 7, 1985." Trial Tr. vol. I, 1881, Oct. 2, 2000. In discussing the evidence he also stated

Now we will tell you that the evidence will also show that she is dead. She should

25

have made her appointments, she should have been where she said she would be and she could have come home but she didn't and that's why we can tell you that she is dead.

*Id.* at 1884-85.

Bierenbaum argues that even if it were within the range of reasonable strategic choices to concede that Katz was dead, it was not reasonable to concede that she died on the Sunday she disappeared. We disagree. With the benefit of hindsight, conceding that Katz died on July 7 may seem extraordinary, but at the time counsel would have had reason to believe that the jury was likely to hear from several reliable sources that she had appointments for the next day, and that she would have kept those appointments if she could have. Counsel's theory was that Katz left the apartment on Sunday, and met with foul play after she left. It was consistent with that theory to concede her death on July 7. It was not objectively unreasonable to do so. Moreover, it was a reasonable trial strategy to establish a forthright relationship with the jury, by conceding what the defense did not have evidence to contest.

### 3.     Opening the Door

In his opening statement counsel told the jury "You will also learn that the police conducted a forensic examination of the doctor's apartment, the doctor's car, his friend's car that he borrowed some time that weekend, the airplane and found no evidence of blood or any other biological determinations . . . because . . . this case also turns on the lack of evidence." *Id.* at 1889. In fact, the police were not permitted to conduct a forensic search of the apartment.

The prosecution successfully argued that counsel had "opened the door" to allow testimony from Detective Dalsass that Bierenbaum's attorney had prevented the police from

26

conducting a warrantless forensic search of the apartment.  Dalsass testified that Bierenbaum's

attorney gave permission for the police to conduct a limited search for items that might help to

identify Katz.  Prior to that date he had not been permitted to enter the apartment.  He stated that

he nevertheless attempted to look for any evidence that a crime had been committed in the

apartment, that he discovered no such evidence, but that he had not conducted a detailed forensic

search.

The prosecution also produced the testimony of Karen Caruana, a woman with whom

Bierenbaum had a brief affair shortly after Katz disappeared.  Caruana testified that Bierenbaum

told her in August or September that his apartment had been searched and that the police had

cleared him.

In summation the prosecution argued that

[Bierenbaum] tells Karen Caruana, "You know the cops searched my apartment.
They found nothing, I've been cleared," and in the time frame we're talking about
it's clear that he's telling Karen Caruana that the cops have cleared him before
they've even been inside his apartment. . . . Cops hadn't searched anything yet.
One of the main reasons is because the defendant wouldn't let them search the
apartment.  The defendant and his attorney stopped the cops from doing a
complete forensic search on the apartment.  Ladies and gentlemen, eyeballing the
bathtub and walking around the apartment are no substitute for a complete
forensic search . . ."

Trial Tr. vol. IV, 3212, Oct. 23, 2000.  Defense counsel made no contemporaneous objection, but

after the summation and before the jury charge he moved for a mistrial on that and other grounds.

The trial judge denied the motion, but offered to tell the jury that Bierenbaum had no legal

obligation to allow a search of his apartment, that he had a right to act on advice of counsel, and

that the jury should draw no negative inference from that; but that in fact the apartment was not

27

fully searched. Counsel accepted the offer and the trial judge instructed the jury:

> Let me also state that the defendant had no legal obligation to allow the police to search his apartment at any point, but -- and certain evidence came out concerning a search of his apartment. Your recollection controls. That involved advice of counsel. I want to remind you that every individual has a right to an attorney and you can draw no negative inference from the fact that someone hires an attorney.

*Id.* at 3259.

Bierenbaum argues that the Dalsass testimony was inadmissible absent defense counsel's remark, and the prosecution could not therefore have used it in summation. Again, we disagree. Although defense counsel mistakenly referred to the search of Bierenbaum's apartment as a forensic search, omitting the term "forensic" from counsel's opening statement would not have prevented the prosecution from eliciting Dalsass's testimony that a limited search of the apartment was conducted several weeks after Katz disappeared. A strong piece of the defense was the fact that there was no physical evidence to link Bierenbaum to the crime. Bierenbaum does not suggest that counsel should not have stressed the lack of evidence, or should not have mentioned that searches of the apartment, cars and airplane turned up nothing. ("This case . . . turns on the lack of evidence.") In order to put the absence of physical evidence in context, the prosecution would have been permitted to inform the jury that the police were constrained to a limited search of the apartment several weeks after the disappearance. Regardless of defense counsel's error in referring to the search as a "forensic search," the prosecution would also have elicited the fact that Bierenbaum lied to Caruana about the search.

In summation the prosecution improperly argued that Bierenbaum and his attorney

28

prevented the police from conducting a complete search.  When the trial court's attention was drawn to this error, it refused to order a mistrial, but offered an instruction, admonishing the jury that it could draw no negative inference from an individual's acting on advice of counsel.  Defense counsel did not object to the instruction or request a stronger one.  Moreover, at that point in the summation, the prosecuting attorney was cataloguing what he termed Bierenbaum's lies--to Dalsass, to O'Malley, to Caruana, and several other witnesses.  He did not focus on Bierenbaum's having prevented a forensic search.  Given that the testimony was independently admissible, and the trial court gave a curative instruction in connection with the improper closing argument, defense counsel's mistaken reference to a forensic search did not "open the door" to prejudicial comments.

### 4.      Failing to call two witnesses

Defense counsel did not call two individuals whom Bierenbaum contends witnessed Katz leaving the apartment and the building in accordance with his narrative of events on July 7, 1985.  June Sherman lived directly below the Bierenbaum apartment.  According to her affidavit, she was acutely aware of Katz, who frequently screamed at her husband and walked around noisily in high-heeled shoes.  She states that on the morning Katz disappeared, Katz was screaming at someone.  Sherman heard the noise of the high-heeled shoes, then she heard the door slam, and both the shouting and the sound of high heels on the floor stopped.  She heard nothing more.  Sherman believed that Katz left the apartment when the door slammed.

During the trial defense counsel unsuccessfully attempted to serve Sherman, who

29

had moved to Arizona. Bierenbaum faults the district court for concluding that counsel's efforts to secure her testimony were diligent, and concluding that failure to present her testimony did not prejudice the defense.

Regardless of whether counsel's performance was deficient in failing to secure Sherman's testimony, Bierenbaum cannot show prejudice. Sherman's testimony would not have undermined confidence in the jury's guilty verdict. Sherman would have testified that she believed Katz left the apartment after the door slammed. She would have had to admit that she did not see Katz leave, nor could she be sure that the door was the exterior door, rather than an interior door. The prosecution would have argued that even if the jury believed Sherman was testifying truthfully about what she heard, her testimony was consistent with the prosecution's theory that Bierenbaum killed his wife in the course of an explosive argument.

Pablo Alvarez was employed at the apartment building in 1985. One of his duties was to relieve the doorman at lunchtime. According to his affidavit, on the Sunday before Katz's parents and the police inquired about her, he relieved the doorman, Edgar Rivera, at approximately 11:30 a.m. At that time he saw Katz leave the front entrance of the building wearing shorts and a t-shirt. He did not see her return.

Defense counsel decided not to call Alvarez. The decision not to do so was a defensible trial strategy. Bierenbaum does not dispute that Alvarez told the authorities in July 1985 that he did not recall seeing Katz on July 7, and that he did not remember how she was dressed the last time he did see her. Bierenbaum contends that even if Alvarez's

30

recollection was "shaky," his testimony was essential to counter the prosecution's argument that Bierenbaum lied when he told Detective O'Malley that a doorman named Edgar had seen Katz leave the building.

Detective O'Malley testified that in their first conversation Bierenbaum told him that a doorman named Edgar had seen Katz leave the building on July 7. When O'Malley followed this up in a second conversation, Bierenbaum said that Edgar was now not sure whether he'd seen her on that or another day. Edgar Rivera told the police that he did not remember seeing Katz on July 7. When Rivera testified at trial, he stated that he could not remember anything about July 7, 1985.

Had the defense called Alvarez, and had he testified in accordance with his affidavit, the jury would have been presented with the testimony of the relief doorman, who remembered not only the departure of a particular tenant, but what she was wearing on an unremarkable Sunday fifteen years before the trial. They would have to have ignored the fact that when asked about that Sunday fifteen years ago, Alvarez, like Rivera, did not recall seeing Katz leave the building.

Under the circumstances, it was reasonable for defense counsel not to call Alvarez. Rivera's testimony was not particularly damaging to Bierenbaum's case. Detective O'Malley testified that Bierenbaum told him he'd made a mistake, and that Rivera wasn't sure when he'd seen Katz. The prosecution did argue in summation that Bierenbaum lied about the doorman, but the thrust of the argument was that Bierenbaum

31

never spoke with Rivera at all in the days after Katz's disappearance.[3] The Alvarez testimony, if believed, would not have countered this argument, as Alvarez did not claim that he'd mentioned his sighting of Katz to Bierenbaum, or anyone else, during this period.

"'The decision not to call a particular witness is typically a question of trial strategy.'" *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) (quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam)). The decision not to call Alvarez was "within the range of acceptable strategic and tactical alternatives." *Luciano*, 158 F.3d at 660.

### 5. Failure to cross-examine witness Anthony Segalas concerning Katz's use of cocaine

Anthony Segalas testified at trial that he and Katz used cocaine together twice. In 1985 Segalas had told Detective Dalgass that he and Katz used cocaine on numerous occasions. The police report also stated that Katz phoned Segalas in June 1985 and asked him to examine some cocaine she had bought, because she thought she had received a short amount.

Bierenbaum faults defense counsel for failing to impeach Segalas with his prior statements, claiming that this damaged the defense theory that Katz's drug usage and risky behavior may have led to her disappearance. Counsel suggested in his opening statement that "You will also learn . . . that she had a drug issue and you will learn . . . at

---

[3] Although there was no evidence to that effect, defense counsel did not object.

least one of the lovers Gail Katz Bierenbaum took behind Dr. Bierenbaum's back was also someone she shared drugs with, and you will learn it from his own testimony." Trial Tr. vol. I, 1889.

In summation, counsel attacked the prosecution's use of the videotapes that showed how a body could have been loaded into an airplane and dropped into the sea, asserting that the videotapes did not supply proof of what happened to Katz. Directly following this argument he alluded to the films "Panic in Needle Park," and "Looking for Mr. Goodbar," and suggested, in a similar vein, that these movies did not prove that Katz's drug use and risky behavior were connected to her death. Later in his summation, he returned to the drug-related disappearance theory:

> . . . Segalas--they did a little bit, what they thought was cocaine that was left in the house. Was she killed by drug dealers? That is one of the theories that could have happened. It is possible. Segalas said she is the one who made the connection. It is not the first time an innocent drug buyer gets killed in the course of a drug deal. . . . It was a different city then, a dangerous place, Gail Katz Bierenbaum may very well have found by virtue of some of her own behavior danger.

Trial. Tr. vol. IV, 3142.

Had the defense gotten Segalas to admit that he and Katz used cocaine on several occasions, the defense suggestion that she may have been killed by drug dealers would still have been plagued by lack of evidence, as the state court noted. The defense, knowing that the alternate scenarios for Gail Katz's death had little in the way of factual support, apparently chose to cast all of the scenarios--the prosecution's included--as merely theories, which could not be proven beyond a reasonable doubt. For this strategy,

33

the defense had no particular need to elicit evidence that Katz was a regular as opposed to occasional user. Even a neophyte could have "found . . . danger." Pressing the point on cross-examination risked alienating the jury for no particular strategic gain.

The state court's determination that the cross-examination of Segalas was not constitutionally deficient was not an unreasonable application of *Strickland*.

### 6. Failure to properly object to the admission of the videotaped demonstration

On direct appeal, Bierenbaum contended that the trial court erroneously admitted videotapes, demonstrating how a pilot can, without assistance, place a flight bag loaded with one hundred ten pounds of weight into a Cessna 172, fly the plane over the ocean and push it out. The Appellate Division found the error unpreserved, and declined to review it.

When the prosecution gave notice during trial that it had provided copies of the videotapes to the defense, counsel stated "I suspect we'll object." The trial judge responded "And I suspect I'll allow it." Trial Tr. vol. III, 2820, Oct. 12, 2000. The videotapes were subsequently offered into evidence without objection. The Appellate Division held that Bierenbaum had not effectively protested the admission of the videotapes under New York's preservation rule, which "'require[s], at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error.'" *Richardson v. Greene*, 497 F.3d 212, 218 (2d Cir. 2007) (quoting *Garcia v. Lewis*, 188 F.3d 71, 78 (2d Cir. 1999)); *see*

34

N.Y. Crim. Proc. Law § 470.05[2].

Bierenbaum now argues that his counsel was ineffective for failing to properly object to the admission of the videotapes. He contends that the videotapes lacked any foundation in the evidence and were based on speculation. On that point we agree with the Appellate Division, the post-judgment motion court and the district court "that the contents of the videotape[s] depict a scenario that was anything but speculation. Rather, the tape's contents clearly demonstrate the feasibility of the People's theory of this case, a theory which all of the circumstantial proof together overwhelmingly shows." *Bierenbaum*, 748 N.Y.S.2d at 589 (dictum). Given that the videotapes were neither speculative nor lacking in foundation, counsel was not ineffective for failing to object to their admission on that basis.

### 7. Failure to move for dismissal on the ground of insufficient evidence of specific intent to kill

At the close of the prosecution's case, defense counsel "move[d] for a trial order of dismissal of the single count of the indictment" because "the People failed to establish every element of the crime charged[,] and this case particularly in . . . its circumstantial nature is insufficient to go forward for a jury resolution." Trial Tr. vol. IV, 3009-10, Oct. 18, 2000. Following the close of evidence, counsel "move[d] to dismiss the indictment . . . on the basis that the People have failed to prove their case beyond a reasonable doubt and to the legal standard required for the case to go to the jury." *Id.* at 3107, Oct. 23, 2000.

Under New York law, "[a] person is guilty of murder in the second degree when .

35

. . [w]ith intent to cause the death of another person, he causes the death of such person . . . ." N.Y. Penal Law § 125.25[1]. A trial court may issue a trial order of dismissal as to any count of an indictment on "the ground that the trial evidence is not legally sufficient to establish the offense charged." N.Y. Crim. Pro. Law § 290.10[1]. Under New York law, a motion to dismiss for insufficient evidence must "be specifically directed at the alleged error." *People v. Gray*, 652 N.E.2d 919, 921 (N.Y. 1995) (internal quotation marks omitted).

Bierenbaum claims that his counsel was ineffective because his motions did not specify that he was challenging the element of intent to kill, and that therefore he could not seek review of this claim on direct appeal.

Although on this record the Appellate Division could have found a claim of lack of intent to kill unpreserved, it addressed the legal sufficiency of both elements of second degree murder: "The People proved beyond a reasonable doubt that this defendant had the opportunity, the motive, and the intent to kill his victim, and that it was he who did so." *Bierenbaum*, 748 N.Y.S.2d at 579. Given that the Appellate Division reviewed the claim that the evidence was legally insufficient to prove that Bierenbaum intended to cause Katz's death, he cannot claim that counsel was ineffective in failing to preserve the issue for appeal.

### 8. Failure to object to summation remarks

Bierenbaum faults his trial counsel for failing to object when the prosecution argued in summation that Bierenbaum allowed an argument to "get explosive" and

36

choked Katz as he had done before, only this time to her death.[4] He argues that the statements invited the jury to consider the 1983 choking incident as evidence of propensity, and that there was no evidence that Katz died by strangulation or that Bierenbaum stood over her as she died.

Although trial counsel made no contemporaneous objection to the summation, before the jury was charged he moved for a mistrial on this and other grounds.[5] The trial court denied the motion, finding that the prosecution had not argued propensity, but that the incident was probative of other issues in the case, particularly intent. The trial court also thereafter advised the jury:

---

[4] The prosecution argued:
What does he do? He does not . . . tr[y] to defuse the situation. He lets it get explosive and as he has done before, as only he has done before, he places his hands around her neck and begins to choke her. But he chokes her much harder than he'd done when she was only having a cigarette. Chokes her much harder than when he had only strangled her to unconsciousness. He chokes her to death.

. . . He knew in July of 1985, what it would take to render her unconscious. He'd done it in the past. He knew in July of 1985, what it would take to kill her. He didn't stop when he knew he was hurting her. He didn't stop when he knew she was unconscious. He only stopped when she was dead. . . . We think about the intimacy of strangulation. How close up you are with a person that you are choking. . . . Strangulation is up close and personal. You watch as it literally squeeze[s] the life out of another human being. Think about the defendant. His anger at his wife. Think about him looking at her while he squeezes the life out of her. Think about him standing over Gail Katz as she feels and he watches the life ebbing from her body. Now, you know what his intent was.
Trial Tr. vol. IV, 3194, 3227-28.

[5] Bierenbaum also takes exception to his trial counsel's failure to object to the prosecution's contention that he prevented a complete forensic examination of the apartment. We addressed this point in connection with counsel's mistake in referring to a "forensic" examination in his opening statement, and found no prejudice.

. . . I have allowed the People to introduce evidence that on another occasion this defendant committed a prior, what we call legally ["]bad act,["] to wit, the strangling of Gail Katz Bierenbaum to unconsciousness and that was allowed in for certain limiting purposes and I want to make that very clear, as I did at the time such evidence was admitted. The fact that this defendant allegedly committed a prior bad act is no proof whatsoever that he possessed a propensity or disposition to commit the crime charged in this indictment or any other crime. It is not offered for such a purpose and it must not be considered by you for such a purpose. Instead the People were allowed to offer such evidence or introduce such evidence solely . . . as probative of or relevant to or to demonstrate defendant[']s intent[--]as they claim[--]to murder Gail Katz Bierenbaum . . . as probative of his identity as the person they claim committed the murder and when they summed up to you and made their arguments, I allowed those arguments on those points.

Trial Tr. vol. IV, 3267-68.

Bierenbaum's counsel explained that he was concerned that a contemporaneous objection would have prompted the trial court to "sum up" in favor of the prosecution, in other words, to highlight for the jury the argument that counsel found objectionable. The strategy was a reasonable one, given that the trial court would have provided a limiting instruction along the lines of the one given in the charge. The Appellate Division concluded that the trial court's cautionary instructions about the prior assault evidence were "legally satisfactory" and adequately protected Bierenbaum's right to a fair trial. *Bierenbaum*, 748 N.Y.S.2d at 583.

### 9. Failure to request charge on territorial jurisdiction

Prior to trial Bierenbaum's attorney moved to dismiss the indictment, contending that the evidence presented to the grand jury failed to prove that New York had jurisdiction to prosecute him for the murder, because assuming that Katz was dead, there was no evidence that her death occurred in New York. The motion was denied.

38

Bierenbaum argues that his trial counsel was ineffective for failing to request a jury charge to the effect that the prosecution must prove beyond a reasonable doubt that the crime occurred within the state of New York. *See People v. McLaughlin*, 606 N.E.2d 1357, 1359 (N.Y. 1992) ("[F]or the State to have criminal jurisdiction, either the alleged conduct or some consequence of it must have occurred within the State.").

During trial the evidence was uncontroverted that Bierenbaum repeatedly stated to friends, to relatives and to the police that he last saw his wife in their apartment in Manhattan. Bierenbaum's only witness was Joel Davis, who saw a poster of the missing Katz and reported sighting her on a Manhattan street on the afternoon of Sunday, July 7.

Bierenbaum suggests now that a jury could have concluded that if he killed his wife on July 7, 1985, he might have done so in New Jersey and not in New York. It was a reasonably defensible legal strategy to conclude that on the state of the evidence at trial the jury should be asked to make a choice between two, not three theories of the case. If the jury harbored a reasonable doubt concerning Bierenbaum's guilt, an instruction on jurisdiction would not have assisted the defense. If the jury concluded beyond a reasonable doubt that Bierenbaum committed the murder, the jurors would not have harbored a reasonable doubt that it occurred in the apartment. Defense counsel could reasonably have concluded that it made no sense to request a territorial jurisdiction instruction--unsupported by any evidence--that contradicted the defense's theory of the case, that Katz left the apartment alive and was alive that afternoon on the streets of Manhattan.

39

None of the alleged errors, individually or collectively, amount to constitutionally deficient representation. It follows that the state court's rejection of Bierenbaum's ineffective assistance of counsel claim was not an unreasonable application of the *Strickland* standard. *See Hemstreet v. Greiner*, 491 F.3d 84, 90 (2d Cir. 2007).

## CONCLUSION

The district court's denial of petitioner's application for a writ of habeas corpus is affirmed.

CALABRESI, Circuit Judge, concurring *dubitante*:

I join Judge Sessions's opinion fully because I believe it to be correct on the law. I add a few words because this case troubles me. I believe the representation given to Appellant by his trial counsel left a lot to be desired, though, for the reasons stated in Judge Sessions's opinion, it does not ultimately amount to constitutionally inadequate representation. I also believe that the evidence of guilt is very thin. The sufficiency of the evidence, however, is not before us. All this means that the decision of the district court is properly affirmed.