United States v. Sainfil

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2021
No. 20-778

UNITED STATES OF AMERICA,
*Appellee*,

*v.*

OVELL GAHAGEN, AKA O, QUINCY HOMERE, AKA Q, MARCUS WELLS,
VINCENT BIFOLCO, JAYSHANT ROSE, AKA DRED,
*Defendants*,

ANAEL SAINFIL, AKA M,
*Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of New York

ARGUED: MAY 17, 2022
DECIDED: AUGUST 10, 2022

Before:  KEARSE, JACOBS, and NARDINI, *Circuit Judges*.

On January 25, 2018, a jury convicted Anael Sainfil of conspiracy to commit armed bank robbery in violation of 18 U.S.C. § 371; armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d); and brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A).  The United States District Court for the Eastern District of New York (Denis R. Hurley, *Judge*) sentenced Sainfil to 219 months in prison.  Sainfil appeals, challenging the district court's denial of his motion for a new trial based on his counsel's purported ineffective assistance in (a) failing to move to suppress Sainfil's pre-*Miranda* statement to an agent of the Federal Bureau of Investigation and (b) conceding to the jury that Sainfil was outside the bank when it was robbed.  Sainfil also challenges the sufficiency of the evidence and argues that his sentence was procedurally and substantively unreasonable.  Among other things, Sainfil argues that the district court clearly erred in determining that his co-defendant's use of body armor during the armed robbery was reasonably foreseeable.  We find no merit in these claims and accordingly **AFFIRM** the judgment of the district court.

Judge Jacobs concurs in part and dissents in part in a separate opinion.

———————————

MARK MISOREK (Kevin Trowel, *on the brief*), Assistant United States Attorneys, *on behalf of* Breon Peace, United States Attorney, Eastern District of New York, Brooklyn, NY, *for Appellee*.

MICHAEL RAYFIELD (Nicolas E. Rodriguez, *on the brief*), Mayer Brown LLP, New York, NY, *for Defendant-Appellant*.

———————————

WILLIAM J. NARDINI, *Circuit Judge*:

A jury convicted defendant Anael Sainfil of armed bank robbery and related offenses in connection with the November 2015 robbery of a Wells Fargo Bank in Hempstead, New York. Sainfil moved for a judgment of acquittal under Rule 29 and a new trial under Rule 33 of the Federal Rules of Criminal Procedure. The United States District Court for the Eastern District of New York (Denis R. Hurley, *Judge*) denied both motions and sentenced Sainfil to 219 months in prison. On appeal, Sainfil challenges the district court's denial of his Rule 33 motion based on his trial counsel's purported ineffective assistance in (a) failing to move to suppress Sainfil's pre-*Miranda* statement to an agent of the Federal Bureau of Investigation ("FBI"), which effectively admitted that he was outside the bank when it was robbed, and (b) conceding that fact before the jury and arguing that his presence was merely coincidental. Sainfil also challenges the sufficiency of the evidence and argues that his sentence

was procedurally and substantively unreasonable. Among other things, Sainfil argues that the district court clearly erred in finding that his co-defendant's use of body armor during the robbery was reasonably foreseeable.

For the reasons discussed below, we reject Sainfil's claims and **AFFIRM** the judgment of the district court.

## I. Background

### A. The indictment

On December 20, 2016, a grand jury returned an indictment charging Anael Sainfil, Ovell Gahagen, Quincy Homere, and Marcus Wells with robbing the Wells Fargo Bank in Hempstead, New York, on November 9, 2015, using firearms. The indictment alleged that the four defendants robbed the bank with others, and the government presented evidence at trial indicating that the defendants' other co-conspirators included Jayshant Rose, Yusuf Jackson, Andrew McCarthy, and Tasha Chance. The government also presented evidence indicating that the co-conspirators used the home of a

4

woman named Marcy as a staging area for the robbery. As to Sainfil specifically, the indictment charged him with three counts: conspiracy to commit armed bank robbery under 18 U.S.C. § 371; armed bank robbery under 18 U.S.C. § 2113(a) and (d); and brandishing a firearm during a crime of violence under 18 U.S.C. § 924(c)(1)(A)(ii). In the conspiracy count, the indictment alleged that Sainfil served as a lookout outside the bank while his armed co-conspirators went inside and took the money. App'x at 34. As to the armed bank robbery and firearms charges, the indictment cited 18 U.S.C. § 2, which provides for aiding and abetting liability. Sainfil pleaded not guilty and went to trial.

## B. The trial evidence

Over two days, the government presented the jury with various exhibits, including footage from the bank's surveillance cameras that, the government suggested, showed Sainfil outside the bank in the moments just before the robbery. It also offered testimony from nine

witnesses, including three cooperating co-conspirators who had pled guilty to their involvement in the robbery. According to this testimony, Sainfil and his co-conspirators carefully planned the robbery over a period of months, between August 2015 and November 2015; attempted to rob the bank in October 2015 but called it off at the last minute; and finally executed the robbery in November of that year. The defense case was limited to a single composite video from the bank's surveillance system, which was offered to suggest that Sainfil was not the person recorded in the government's videos.

### 1. The planning of the bank robbery

The government offered testimony from Chance, a former employee at the bank who became romantically involved with Homere. In July 2015, after Chance had been terminated from her job, Homere contacted her and explained that he intended to rob the bank but needed information from her about its security and operations.

Homere arranged with Chance to meet him at his studio. When she arrived, Sainfil met her and brought her upstairs to a bedroom where they met with Homere. The three spent an hour discussing the robbery. Sainfil did most of the talking, asking Chance about the bank's day-to-day operations, the specific locations where cash was stored in the bank, and how to access the vault. Sainfil said to Chance, "If we're going to do this you got to do this right. We can't have any mistakes. Now I need you to walk me through who is working there, who has keys, who has codes." App'x at 368–69. Sainfil and Homere talked about certain bank employees, including a certain teller. Homere suggested that the co-conspirators could fake a car accident and kidnap that teller the night before the bank robbery, and Sainfil added that a person could be "at the house with [the teller's] dad" because "[the teller] is close with [the teller's] dad and . . . wouldn't want anything to happen to [him]." *Id.* at 371. The next day, at another meeting at the studio, Sainfil questioned Chance closely

about a new security guard at the bank and said to her: "We cannot miss a beat. We have to stay on track of who's there, how long it takes them to come in, and who is the new people that worked at the bank." *Id.* at 372.

Other co-conspirators corroborated that Sainfil met with Chance and Homere in the months before the bank robbery. McCarthy testified that on two or three occasions in 2015 he saw Chance, Homere, and Sainfil meeting behind closed doors for about 15 minutes each time. Gahagen testified that he saw Chance come to meet Homere three to six times during the summer of 2015 and saw Chance, Homere, and Sainfil meet for about 15 minutes at least once.

McCarthy testified that, during the planning phase, he and Sainfil said they were not willing to go into the bank during the robbery. Instead, McCarthy agreed to serve as a driver, while Sainfil agreed to be a lookout. Sainfil explained, "If anything goes wrong like being pulled over by the police, I'm only looking [at] spending a

8

small amount of time, two or three years. I'm not going into the bank." App'x at 164. McCarthy also testified that Sainfil was present at a meeting with Homere during which Homere detailed the drop-off and pick-up locations of the co-conspirators after the robbery to McCarthy.

### 2. The aborted attempt

In October 2015, Homere told Sainfil, McCarthy, and Gahagen that he was ready to rob the bank. McCarthy picked up Jackson and Wells and drove them to a staging area at Marcy's house. McCarthy saw Sainfil and others at Marcy's house preparing for the robbery by putting on black gear, masks, and gloves, and getting an AK-47 and three pistols. After an hour, Homere told Sainfil to "go look in the parking lot and see if you see anybody walking, parking, sitting in their cars" and to call Homere to report what he saw. App'x at 172. Sainfil left Marcy's house and called Homere fifteen minutes later; Homere then announced that "[Sainfil] says it's clear." *Id.* at 172–73.

9

The co-conspirators left Marcy's house and went to the bank with the guns. However, after arriving at the bank but before entering to rob it, Homere saw someone in a car and announced that it "doesn't feel right," App'x at 175, and so they all left the bank. McCarthy did not see Sainfil at the bank.[1]

### 3. The robbery

McCarthy testified that on November 9, 2015, Homere told him that they were again ready to rob the bank. After dressing in black, McCarthy left his house and met Sainfil, Homere, and Gahagen. Homere, McCarthy, and Gahagen picked up Jackson and Wells. These five co-conspirators went to Marcy's house where they found Sainfil and Rose. Gahagen testified that Sainfil and others were in the garage, where guns and zip ties were getting wiped of fingerprints,

---

[1] Wells recalled a slightly different version of the aborted attempt. Wells testified that he did not see Sainfil at Marcy's house before the aborted attempt. According to Wells, Homere did not want to go into the bank because people might be in the bank's parking lot. As a result, Wells testified that Sainfil was outside the bank during the actual robbery on November 9 to make sure that nobody was in the bank's parking lot.

and Wells was putting on his bulletproof vest. After everyone was ready, Homere sent Sainfil to the bank and told him to make sure no one was in the parking lot and to call to report what he saw.

McCarthy then drove Homere, Jackson, Rose, and Wells to the bank's parking lot. Five minutes later, McCarthy saw Sainfil walk from the rear of the bank through the drive-through side wearing a hoodie and possibly an ear piece. At the same time, McCarthy saw Homere on the phone and overheard him directing Sainfil to look into specific cars; McCarthy recalled seeing Sainfil look into the same cars described by Homere as he was talking about them. After Sainfil looked into four or five cars and walked past McCarthy's car, Homere told McCarthy to pull up in front of the bank. Homere, Jackson, Rose, and Wells then got out of the car and went into the bank.

Once inside, the co-conspirators announced that they were robbing the bank. Homere brandished an AK-47 rifle. Jackson displayed a .357 revolver. Rose and Wells displayed BB guns. They

11

told bank employees to open safes and the ATM inside the vault. One conspirator told a teller that they knew who she was and where she lived. Rose and Wells zip-tied employees and customers, including an eight-year-old boy. A bank employee grabbed a bag of money with more than $375,000, placed a wireless GPS tracker in the bag, and handed it over. They left through the back of the bank, where McCarthy picked them up and they sped away.

### 4. Post-robbery events

After leaving the bank, the co-conspirators split up. Homere, Jackson, and Rose drove off in a BMW; McCarthy and Gahagen fled in a second car; and Wells took a third car. Police pursued the BMW until it stopped and the three occupants fled on foot; Homere and Rose escaped, but the officers caught Jackson. The police searched the BMW pursuant to a warrant and recovered a bag of cash, a loaded AK-47, a ski mask, Homere's cell phone, and the GPS tracking device. Homere's DNA was later recovered from the mask, and Jackson's

12

DNA was located on another mask found near the BMW. After Jackson's arrest, law enforcement also retrieved the loaded .357 revolver that Jackson discarded when he fled.

Later that evening, Gahagen and McCarthy saw Sainfil who, according to McCarthy, said, "[W]e did it. I can't believe we did it." App'x at 185. Wells testified that on the day after the robbery, Sainfil and Homere came to Wells's home and told him that the police had taken the money. Sainfil and Homere threatened Wells to keep quiet and said they knew where his children lived.

Sainfil was arrested on December 21, 2016. An FBI agent testified that, before Sainfil was given a *Miranda* warning, the following occurred:

> As we were transporting Mr. Sainfil to our office, he was asking questions about his situation . . . . I told him we would be talking more once we got to our office, that everything would be explained to him . . . . [When Sainfil] kept asking why he was being arrested . . . . I told him we had an arrest warrant for him in relation to the Wells Fargo bank robbery. I guess it was a year prior at that point in November. And I told him we knew he was

13

involved in the bank robbery . . . . [When] he said, you are saying I robbed a bank, as a question, . . . I said, we know you were involved as a lookout while your friends were inside the bank you were outside. [Sainfil responded] just because I was outside the bank doesn't mean I robbed it.

App'x at 336–37.

After arriving at the FBI office, agents provided Sainfil with a *Miranda* waiver form, which he initialed. Two agents briefly interviewed him. One agent told Sainfil, "[W]e know you were outside the bank acting as a lookout," to which Sainfil shrugged and replied, "[I]t doesn't mean I robbed a bank." *Id.* at 341. Sainfil then invoked his right to remain silent and the agents ended the interview.

Sainfil's trial attorney never moved to suppress any of Sainfil's statements to the FBI. At trial, the government presented the statements to the jury through the testimony of the arresting FBI agent and relied on those statements during both its opening and closing arguments. During his opening statement, Sainfil's trial counsel stated: "You're going to hear that Anael [Sainfil] was outside the

14

bank.  That happened.  He was outside the bank.  That doesn't mean that he participated in this robbery."  App'x at 55.

The government presented excerpts from one of the bank's surveillance videos showing a person (who the government asserted was Sainfil) walking through the area behind the bank and heading toward the parking lot.  In response, the defense presented a composite of other bank surveillance footage purportedly showing that the person in the government's video was a white male, and thus could not be Sainfil, who is black.  In its closing argument, the government stated: "[T]he video is what it is.  If you only had the video in this case we wouldn't be here, right?"  App'x at 429.

### 5.  Verdict and post-trial motions

On January 25, 2018, the jury found Sainfil guilty of all three charges. Sainfil moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, alternatively, for a new trial under Rule 33.   Sainfil's Rule 29 motion was premised on purported

inconsistencies in the testimony of the government's witnesses, which he argued undermined the sufficiency of the evidence supporting his convictions. Sainfil's Rule 33 motion was premised on the purported failures by trial counsel to object to the introduction of the bank surveillance video evidence and to move to suppress Sainfil's pre-*Miranda* statements to the FBI. Sainfil also submitted a declaration explaining the meaning of his pre-*Miranda* statements:

> I have been to the Wells Fargo Bank in Hempstead with the defendant Quincy Homere numerous times on routine business where I waited for him outside the bank. I have no doubt that I may have been on the bank surveillance camera system on any one of these occasions in the parking lot. Since I did not know the date of the robbery when I was arrested . . . , it was possible I could even have been there earlier on the day of the robbery and not known it. . . . When [the FBI agent] arrested me, I was surprised when he told me I was being arrested for bank robbery, and when he accused me of being outside the bank I stated to him "being outside the bank does not make you a robber." At the time I did not know when the [r]obbery was so I could not make a more specific denial.

App'x at 471–72.

The district court denied Sainfil's motions. With respect to the Rule 29 motion, the district court found that the evidence at trial supported Sainfil's convictions, and that the purported inconsistencies in the testimony of government witnesses were raised by defense counsel at trial and rejected by the jury. As to Sainfil's ineffective assistance claim, the court found that counsel's decision to "embrac[e] the post arrest statements was a sound strategy and comported with Defendant's theory of the case, i.e. that he was merely present at the [b]ank." Special App'x at 19. It further determined that a motion to suppress "would have had little chance of success" because it did "not appear that [Sainfil] was subject to the functional equivalent of interrogation." *Id.* Finally, the district court found that the defendant could not show prejudice in light of Sainfil's subsequent post-*Miranda* statement.

### 6. Sentencing

The U.S. Probation Department prepared a Presentence Investigation Report ("PSR") and calculated a base offense level of 20 under the U.S. Sentencing Guidelines. Sainfil did not object to that base offense level. He did, however, object to the PSR's recommendation of two enhancements that are relevant to this appeal: (1) two points for physically restraining victims during the robbery under U.S.S.G. § 2B3.1(b)(4)(B); and (2) two points for the use of body armor during a crime of violence under U.S.S.G. § 3B1.5. Because Sainfil himself did not use physical restraints or body armor, the government had to demonstrate that his co-conspirators did so, and that their actions were "reasonably foreseeable in connection with" the "jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

On February 25, 2020, the district court held a sentencing hearing. The district court applied both of the disputed

enhancements as well as others not material to this appeal, yielding an adjusted offense level of 30. Based on a total offense level of 30 and a Criminal History Category of IV, the district court calculated a Sentencing Guidelines range of 135 to 168 months, which, when combined with the 84-month mandatory consecutive sentence on Count Three, resulted in a total effective Guidelines range of 219–252 months of imprisonment. Applying the factors required under 18 U.S.C. § 3553(a), the district court observed that Sainfil was "a bright individual" and "a good son," and had worked in the suicide prevention program at the facility where he was incarcerated. App'x at 506–07. But the court rejected Sainfil's contention that he was only "peripherally involved" in the robbery. *Id.* at 508–09. The court also found that general and specific deterrence were warranted because of the "horrendous" nature of the robbery. *Id.* at 509. The court sentenced Sainfil principally to 219 months in prison, at the bottom of his advisory Guidelines range.

Sainfil now appeals, challenging both his conviction and sentence.

## II. Discussion

On appeal, Sainfil argues that the district court abused its discretion in denying him a new trial based on his trial counsel's purported ineffective assistance in (a) failing to move to suppress Sainfil's pre-*Miranda* statement to the FBI agent and (b) conceding that Sainfil was outside the Wells Fargo Bank at the time it was robbed. Sainfil also challenges the sufficiency of the evidence and argues that his sentence was procedurally and substantively unreasonable. We disagree on each point.

### A. Standard of review

"The question of whether a defendant's lawyer's representation violate[d] the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed *de novo*." *LoCascio v. United States*, 395 F.3d 51, 54 (2d Cir. 2005) (internal quotation marks omitted). We review *de novo* the

20

sufficiency of the evidence. *See United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006). "We review the procedural and substantive reasonableness of sentencing decisions for abuse of discretion, a standard incorporating *de novo* review of questions of law, including . . . interpretation of the Guidelines, and clear error review of questions of fact." *United States v. Taylor*, 961 F.3d 68, 74 (2d Cir. 2020) (internal quotation marks and alterations omitted).

### B.    Ineffective assistance of counsel

To establish that counsel was constitutionally ineffective, a defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness; and (2) the deficient representation prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). "In order to show ineffective assistance for the failure to make a suppression motion, the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." *United States v. Matos*, 905 F.2d 30, 32 (2d Cir.

1990). We may "entertain an ineffective assistance of trial counsel claim on direct appeal in a narrow category of cases where: (1) as here, the defendant has a new counsel on appeal; and (2) argues no ground of ineffectiveness that is not fully developed in the trial record." *United States v. Yauri*, 559 F.3d 130, 133 (2d Cir. 2009) (internal quotation marks omitted). Here, Sainfil has new counsel and raised the ineffective assistance claim in the district court in his Rule 33 motion. We have concluded that the record is fully developed on this point, and therefore we exercise our discretion to resolve Sainfil's ineffectiveness claim now. *See United States v. Brown*, 623 F.3d 104, 113 n.5 (2d Cir. 2010) ("[T]he proper procedural avenue for defendants who wish to raise ineffective assistance claims after conviction but prior to sentencing is a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.").

Sainfil argues that during the post-arrest, pre-*Miranda* conversation initiated by Sainfil between him and the arresting agent

22

en route to the FBI office, the agent "posit[ed] the guilt of the subject" and thereby conducted an unconstitutional custodial interrogation under *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980) (internal quotation marks and alteration omitted), and *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

The merits of Sainfil's argument are dubious because the agent in the car seems to have been merely responding to Sainfil's inquiries about why he had been arrested. We need not definitively resolve that question, however, because even if Sainfil could demonstrate deficient performance under *Strickland*, we discern no prejudice from the admission of Sainfil's conversation in the car. In his second, post-*Miranda* statement to the FBI, Sainfil effectively said the same thing as the challenged pre-*Miranda* statement—that is, that his being outside the bank on the day of the robbery did not mean that he robbed it. In

23

light of that second statement,[2] together with the testimony of three

cooperating witnesses placing Sainfil outside the bank as a lookout

moments before the robbery occurred, Sainfil has not demonstrated

"a reasonable probability that the verdict would have been different

if the [challenged] evidence had been suppressed." *Matos*, 905 F.2d at

32.

As to trial counsel's concession that Sainfil was outside the

bank, Sainfil has not satisfied *Strickland*'s deficient-performance

prong. Sainfil bases his argument on the purported overall weakness

of the government's case in the hypothetical absence of the challenged

pre-*Miranda* statement. But his trial counsel's concession must be

evaluated in light of the record evidence, including, at a minimum,

Sainfil's post-*Miranda* statement to the FBI (the admissibility of which

Sainfil does not contest, and which strongly suggested that Sainfil was

---

[2] Sainfil does not dispute the admissibility of this second statement. Nor could he, because there is no indication that the FBI agent engaged in a deliberate plan to "question first and warn later," *Missouri v. Seibert*, 542 U.S. 600, 611 (2004), which might call into question the voluntariness of the second statement.

24

not resisting the claim that he was indeed outside the bank during the robbery) and the detailed witness testimony placing Sainfil outside the bank as a lookout. Even considering Sainfil's attacks on the credibility of the cooperating witnesses and his challenges to the probative value of other evidence, we cannot conclude—given the "strong presumption" we must indulge that counsel's conduct fell "within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689—that the district court erred in determining that Sainfil's trial counsel's concession "was a reasonable trial strategy to establish a forthright relationship with the jury, by conceding what the defense did not have evidence to contest." *Bierenbaum v. Graham*, 607 F.3d 36, 52 (2d Cir. 2010); *see also United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

## C. Sufficiency of the evidence

"A defendant challenging the sufficiency of the evidence . . . at trial bears a heavy burden, as the standard of review is exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)

25

(internal quotation marks and citations omitted). A jury verdict must be upheld if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Temple*, 447 F.3d 130, 136–37 (2d Cir. 2006). This Court will "defer to the jury's assessment of witness credibility," even when those witnesses have "testified pursuant to cooperation agreements with the [g]overnment." *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) (internal quotation marks omitted).

On appeal, Sainfil challenges the sufficiency of the evidence underlying his convictions on a single ground: that the evidence did not show he was physically present at the bank during or immediately after the robbery and indeed that the surveillance video conclusively proved that he was *not* the person outside of the bank. These arguments suffer from two flaws.

First, as a legal matter, the government was not obliged to prove Sainfil's physical presence during the robbery to establish his guilt on any of the three charges. His participation in the planning of the armed robbery would have sufficed to establish his guilt on the conspiracy charge (Count One). The same holds true for the armed robbery and firearms offenses (Counts Two and Three), as to which the district court instructed the jury on both aiding-and-abetting and *Pinkerton* liability. *See Pinkerton v. United States*, 328 U.S. 640 (1946); *United States v. Gershman*, 31 F.4th 80, 99 (2d Cir. 2022) (explaining that under *Pinkerton*, a jury "may find a defendant guilty of a substantive offense that he did not personally commit if it was committed by a co-conspirator in furtherance of the conspiracy, and if commission of that offense was a reasonably foreseeable consequence of the conspiratorial agreement" (internal quotation marks omitted)). The same evidence of his planning would have supported his guilt on these two charges under either an aiding-and-abetting or *Pinkerton*

theory, regardless of whether he was present at the bank at the time of the robbery.

Second, as a factual matter, there was abundant evidence putting Sainfil squarely at the scene of the robbery as a lookout. We have already reviewed that evidence above, and so we limit ourselves to a few highlights:

- McCarthy, Wells and Gahagen testified that Sainfil was present at the house where he and the conspirators prepared for the robbery, and then left to conduct surveillance at the bank;

- Just before the robbery, McCarthy watched Sainfil walk from the rear of the bank through the drive-through side of the bank;

- At the same time, McCarthy overheard Homere on the phone with Sainfil directing Sainfil, by name, to look into specific cars near the bank;

- As Homere was directing Sainfil, McCarthy and Wells each saw Sainfil looking into the specific cars being described by Homere;

- Gahagen saw Sainfil walking in front of the bank just before the robbery.

28

And as to the surveillance video, it was within the jury's province to decide whether it depicted Sainfil as opposed to someone else, or whether, even if the person in the video was someone else, Sainfil had still acted as a lookout, albeit outside the range of the cameras. This evidence, viewed in the light most favorable to the jury's verdict, was sufficient to establish the defendant's guilt beyond a reasonable doubt.

### D. Procedural reasonableness

The district court applied a two-level enhancement for the use of body armor by one of Sainfil's co-conspirators under U.S.S.G. §§ 1B1.3, 3B1.5, and a two-level enhancement for the co-conspirators' restraint of the bank employees and customers with zip ties under U.S.S.G. §§ 1B1.3, 2B3.1(b)(4)(B).

The district court applied the two-point physical restraint enhancement, explaining that:

> Four individuals entered the Wells Fargo bank in Hempstead. One has an AK-47, another has a pistol and two others have a BB gun. They enter during business

29

hours. There are people in the bank, i.e., customers as well as employees. Is it reasonably foreseeable under that circumstance that one or more of the bank robbers would endeavor to in some fashion handcuff or tether the customers in the bank and/or employees[?]

It seems to me, again, given the unique circumstances here, that the answer to that has to be yes, otherwise there are people in the bank, one I'm told was an eight year old child, another one was apparently a woman with some age. You would want to immobilize them if you were a bank robber, that would be the appropriate thing to do, otherwise they may try to flee the bank which would be a disaster, they may want to physically intervene and prevent the robbers from accomplishing their designated goal, so it seems to me that again it is reasonably foreseeable, not necessarily known by this defendant who was a lookout as far as this bank robbery was concerned.

App'x at 485–86.

As to the two-point body armor enhancement, the court "accept[ed]" that Sainfil "didn't know that . . . Wells was wearing the body armor." App'x at 481.[3] But it found that Wells's use of a

_____

[3] There was evidence strongly suggesting that Sainfil was in the same room as Wells when the latter donned his body armor. On this point, the government directed the district court to Gahagen's testimony that he saw Wells put on the

30

bulletproof vest fell "within the ambit" of "what a reasonable person

under the circumstances would understand." *Id.* The district court

explained that:

> One of the individuals had an AK-47. They are robbing
> a bank. There may be a security officer. They are robbing
> the bank during the workday. A reasonable person
> would understand under those circumstances that there
> may be gunfire involved, either by a security personnel
> with the bank or by one or more of the co-conspirators.
> So it would make sense to wear body armor.

*Id.*

Absent "clear error," this Court will not disturb the district

court's conclusion that the two enhancements applied to Sainfil

---

vest at Marcy's house and that Sainfil was at that location. Specifically, when
asked where Sainfil was at Marcy's house, Gahagen testified that he was in the
garage. After explaining that there was also activity in the back yard and
driveway, Gahagen was asked what people were doing. He replied, "We were in
the garage. We was preparing to go to the bank. The guns were getting cleaned,
zip ties were getting cleaned. Um, just preparing the guns and everything and
putting on their vests for one person" who, he then specified, was Wells with his
bulletproof vest. Although Gahagen had testified that Sainfil was in the garage
and then appeared to describe what transpired in the garage, the government took
the position that it was "unclear from the testimony whether Mr. Sainfil was in the
garage or present" when Wells put on the vest. App'x at 482. Because the district
court proceeded on the assumption that Sainfil did not have actual knowledge of
the body armor, we do likewise for purposes of this appeal.

because the conduct of his co-conspirators was "reasonably foreseeable" to him. *United States v. Ekwunoh*, 12 F.3d 368, 370 (2d Cir. 1993). There is no "clear error" unless this Court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.*

Section 1B1.3 of the Sentencing Guidelines permits a sentencing enhancement "on the basis of the following":

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> > (i) within the scope of the jointly undertaken criminal activity,
> >
> > (ii) in furtherance of that criminal activity, and
> >
> > (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B). Under these circumstances, as relevant here, the Guidelines provide for two-level enhancements (1) "[i]f any person was physically restrained to facilitate commission of the offense," *id.* §§ 2B3.1(b)(4)(B), 3A1.3; and (2) if "the offense involved the use of body armor," *id.* § 3B1.5.

There is no dispute about the underlying facts: Wells wore a bulletproof vest during the robbery, which he put on at the house where the conspirators, including Sainfil, had gathered to prepare for the robbery; and once inside the bank, Wells and others restrained people with zip ties. There is also no dispute that Wells's use of body armor and the conspirators' use of zip ties were "within the scope of the jointly undertaken criminal activity," § 1B1.3(a)(1)(B)(i), and "in furtherance of that criminal activity," § 1B1.3(a)(1)(B)(ii). Sainfil argues that there was no direct evidence that he discussed the use of body armor and zip ties with his co-conspirators, and that their use was accordingly not reasonably foreseeable to him. We disagree.

33

As to the first question, the district court did not clearly err in concluding that it was reasonably foreseeable to Sainfil that his co-conspirators would use physical restraints (here, zip ties) during the bank robbery. As the district court observed, the robbery was planned to occur during regular business hours, when it would be reasonable to expect both employees and customers to be present. We agree with the government's observation that "[t]he success of a bank robbery depends in significant part on the coconspirators' ability to prevent bank employees and customers from impeding the robbery or reporting it to law enforcement, and restraining victims in furtherance of that goal is reasonably foreseeable to all coconspirators." Gov't Br. at 50. The use of physical restraints was especially foreseeable in the present situation, where the robbery was meticulously planned in advance, with Sainfil meeting alongside numerous participants at a pre-selected location where they dressed, prepared their guns, and wiped off any trace of fingerprints from

their equipment (even down to the bullets) to avoid later detection. And the foreseeability of such restraints was certainly within the reasonable contemplation of Sainfil, who had taken a leading role as organizer alongside Homere. Indeed, they discussed the possibility of kidnapping—that is, restraining—a bank teller the night before the robbery.

Likewise, the district court did not clearly err in finding that the use of body armor was reasonably foreseeable to Sainfil. The district court identified several key facts: (1) the number of participants in the crime: four robbers entered the bank; (2) the use of firearms: one of the robbers was armed with an assault weapon, another had a pistol, and the other two had BB guns; (3) the nature of the target: the conspirators were robbing a bank during the workday; and (4) the possible presence of other firearms: there might be a security officer present. The court concluded that under these circumstances, it was reasonably foreseeable there might be gunfire involved, either from

bank security or the robbers, and so it would be foreseeable that a robber would wear body armor.

We find no clear error in the district court's conclusion. The number of participants in the robbery, and the fact that they were all armed—including one with an AK-47—substantially increased the likelihood that gunfire might erupt. The likely presence of a security officer, who might also be armed, further increased those odds. Indeed, as Chance testified, Sainfil was particularly attuned to the presence of security guards. During the preparatory phase, Sainfil worried aloud to Chance and Homere that he had seen new security guards at the bank, and asked why there was a new security guard. Chance testified that when she explained that she did not know the answers to his questions, because she no longer worked at the bank, Sainfil grew visibly frustrated.[4] Given these circumstances, it was

---

[4] Sainfil argues that, in this case, there was no evidence that any security guards were actually present during the actual robbery. But the relevance of guards is not whether they were actually present, but whether it was reasonably

36

reasonably foreseeable to Sainfil—who, the evidence showed, had meticulously planned the whole operation over a matter of months—that a member of the robbery crew would wear body armor to protect himself from gunfire.

In reaching this determination, the district court reasonably applied the logic of Application Note 3(D) to section 1B1.3, which states that one co-conspirator's assault of a robbery victim is "reasonably foreseeable" to all co-conspirators in the robbery "given the nature of the offense," even where the other co-conspirators "had not agreed to the assault and had cautioned the [other co-conspirator] to be careful not to hurt anyone." U.S.S.G. § 1B1.3, app. note 3(D); *see also United States v. Molina*, 106 F.3d 1118, 1121–22 (2d Cir. 1997) (holding that it was "reasonably foreseeable" under U.S.S.G. § 1B1.3

_____

foreseeable that a co-conspirator would be moved to wear body armor because of the guards' possible presence. Here, Sainfil openly fretted about the possibility of guards, which made it all the more foreseeable to him that one of his co-conspirators might have the same worries and take the precaution of wearing a bulletproof vest.

37

that members of a robbery conspiracy would fire their weapons in furtherance of the conspiracy, where the co-conspirators carried weapons, including a machine gun, and were robbing an armored vehicle guarded by men carrying sidearms, even though they had agreed in advance to not discharge their weapons). Here, given the "nature" of this particular bank robbery, the use of body armor was reasonably foreseeable to Sainfil.

Finally, we reject Sainfil's contention that the application of the body armor enhancement in this case would lead to the automatic application of that enhancement to any armed bank robbery. Sentencing involves an individualized assessment of all the circumstances in a given case. The number and identity of participants in an armed robbery, the number and type of firearms involved, and the extent of a particular defendant's involvement in planning will vary considerably from case to case. It is the role of the district court to conscientiously sift through these facts, making a

38

case-specific determination of whether the enhancement applies. It may be that a different judge might have reached a different conclusion on this record. But "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Sash*, 396 F.3d 515, 521 (2d Cir. 2005) (alterations omitted). There was no clear error here.

### E. Substantive reasonableness

Finally, Sainfil's challenge to the substantive reasonableness of his sentence fails because his 219-month sentence is not "so shockingly high . . . or otherwise unsupportable as a matter of law that allowing [it] to stand would damage the administration of justice." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012) (internal quotation marks omitted). The district court properly concluded that Sainfil was an "essential part" of this "horrendous" crime. App'x at 509. The court further concluded that people, like Sainfil, who "decide to commit armed takeovers of banks should understand if they are apprehended and if they are ultimately

39

convicted, that dire consequences will follow." *Id.* at 509–10. In light of the district court's assessment of the § 3553(a) factors, a bottom-of-the-Guidelines-range sentence of 219 months of imprisonment is not substantively unreasonable.

Sainfil complains that he received a disparately high sentence compared to his co-conspirators, including those who entered the bank. But this argument fails. First, we have explained that "section 3553(a)(6) requires a district court to consider nationwide sentencing disparities, but does not require a district court to consider disparities between co-defendants." *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008). Second, Sainfil does not recognize that "a reasonable explanation of the different sentences here is readily apparent, namely, the varying degrees of culpability and cooperation between the various defendants." *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006). He was a key organizer of the bank robbery, and he did

not cooperate or accept responsibility for his actions. The district court sentenced him reasonably.

## III. Conclusion

In sum, we hold as follows:

(1) Sainfil was not prejudiced by his trial counsel's failure to move for suppression of his pre-*Miranda* statement to the FBI, where he made a similar post-*Miranda* statement that was undisputedly admissible.

(2) Sainfil's trial counsel did not provide objectively deficient performance when he conceded before the jury that Sainfil was outside the bank on the day it was robbed, in light of Sainfil's post-*Miranda* admission, and abundant witness testimony placing Sainfil outside the bank as a lookout.

(3) There was sufficient evidence to support Sainfil's convictions.

(4) Sainfil's sentence was procedurally reasonable. The district court did not clearly err in applying sentencing

41

enhancements based on its conclusion that, given the circumstances in this case, it was reasonably foreseeable that Sainfil's co-conspirators would use physical restraints, U.S.S.G. § 2B3.1(b)(4)(B), and body armor, U.S.S.G. § 3B1.5.

(5) Sainfil's 219-month sentence, at the bottom of the advisory Guidelines range, was substantively reasonable.

We therefore **AFFIRM** the judgment of the district court.

DENNIS JACOBS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority opinion in all respects except as to the application of a two-level sentence enhancement for body armor. On that point, I respectfully dissent.

# I

My position on the body armor can be briefly stated. One of four bank robbers wore a bulletproof vest; and it was not Anael Sainfil, who was the lookout. The district judge found that Sainfil did not know that another robber was wearing it. And there is no evidence that its use was reasonably foreseeable. The particulars are as follows.

In 2015, nine conspirators began planning a bank robbery. The day of the robbery, the crew that was to execute the plan met at a friend's house, where they used the garage to wipe their guns and zip ties clean of fingerprints. One of the robbers, named Wells, used the opportunity to strap on his bulletproof vest. Sainfil entered the garage at some point, but the record does not show when he was there, or what he saw. He was not there the whole time because, pursuant to his lookout duties, he left the house early to scope out the bank.

The four robbers arrived at the bank in one car.  Sainfil, who had arrived earlier, gave the all clear, and the four entered the bank and announced that they were there to rob it.  One carried a rifle, another had a revolver, and the other two displayed BB guns.  Two ordered the bank tellers to open safes and the ATM inside the vault.  The other two zip-tied the remaining employees and customers.  The crew left with more than $375,000, but didn't get far.  A bank employee had slipped a GPS tracking device into the bag of cash, which allowed the police to quickly find and corner the getaway car.

In 2018, Sainfil was convicted of armed bank robbery and related offenses.  The Presentence Investigation Report calculated an offense level of 30.  This figure included, as relevant to this appeal, two-level enhancements for the use of physical restraints and the use of body armor during the robbery.  See U.S.S.G. § 2B3.1(b)(4)(B) (physical restraints); U.S.S.G. § 3B1.5 (body armor).  The total effective Guidelines range was 219-252 months' imprisonment.  The district court imposed a sentence of 219 months.

On appeal, Sainfil challenges application of the sentencing enhancements for both the use of physical restraints and the use of body armor.

## II

I agree with the majority opinion that we must affirm the enhancement for the use of physical restraints. The district court found that the use of physical restraints was "reasonably foreseeable" given that the robbers entered the bank "during business hours" when "[t]here are people in the bank" whom one "would want to immobilize." App'x at 485-86. The government and majority both explained that such immobilization is necessary to "[t]he success of a bank robbery." Maj. Op. at 34 (quoting Gov't Br. at 50). That is evidently why half the criminal manpower that entered the bank was devoted only to restraining people who were not forced to help in looting the safe.

The body armor enhancement, which added over two years to the top and bottom of the Guidelines range, is different in kind. The district court "accept[ed]" that Sainfil "didn't know that Mr. Wells was wearing the body armor." App'x at 481. Instead, the district court relied on the idea that the use of body armor was reasonably foreseeable:

> One of the individuals had an AK-47. They are robbing a bank. There may be a security officer. They are robbing the bank during the workday. A reasonable person would understand under those circumstances that there

3

> may be gunfire involved, either by a security personnel with the bank or by one or more of the co-conspirators. So it would make sense to wear body armor.

Id.

However, there is no record evidence that the supposedly elaborate planning ascertained whether a guard was or would be there, or whether the guard (if there was one) was armed. More importantly, the district court's finding relies on the reasonable foreseeability of gunfire, not of body armor. True, body armor is not (yet) a fashion statement and is rarely (if ever) worn when there is no risk of gunfire. But that does not mean that whenever there is a risk of gunfire, the use of body armor follows. The district court's reasoning sweeps too broadly, and would result in a foreseeability finding whenever someone (else) wears body armor. This proves too much.

The majority, following the line of the district court, notes that Sainfil "meticulously planned the whole operation," and that it was reasonably foreseeable "that a member of the robbery crew would wear body armor to protect himself from gunfire." Maj. Op. at 37. But a mastermind would not allocate one vest to four robbers.

4

The foreseeability analysis is so tenuous that the majority opinion, in footnote 3, labors to advance an alternative ground of actual knowledge. The majority contends "that Sainfil was in the same room as Wells when [he] donned his body armor." Id. at 30 n.3. Actually, that is not so. As I explained above, there is no evidence that Sainfil was there at that time. Moreover, that effort is defeated by the candid and decisive concession that "the government took the position that it was 'unclear from the testimony whether Mr. Sainfil was in the garage or present' when Wells put on the vest." Id. at 31 n.3 (quoting App'x at 482). In any event, the district court made a finding (which no one contests) that Sainfil did *not* know about the use of body armor; and that finding precludes the guess that Sainfil may have been in the garage and saw it being strapped on.

## III

I conclude that the district court clearly erred in its finding of reasonable foreseeability. The government contends that rejection of that finding would impose in effect an actual knowledge standard. Not so. The problem here is that there is no evidence of knowledge *or* of foreseeability, notwithstanding that the government sponsored the testimony of three (out of nine) conspirators,

5

including Wells (who donned the vest).  The government did not elicit from them at trial whether body armor was mentioned in the planning, or whether (or how) Sainfil knew that a co-conspirator owned such armor.  Its existence and use, so far as the record reveals, was unknown to Sainfil and unforeseeable.

The affirmance of the body armor enhancement reduces reasonable foreseeability to a guess, and results in an unjustified piling on of sentencing enhancements.  See United States v. Broxmeyer, 699 F.3d 265, 297-305 (2d Cir. 2012) (Jacobs, J., dissenting).